RECEIVED IN THE PRO SE OFFICE
OCT 1, 2024, 11:29AM
VIA BOX.COM

# VID GANESH

191-11 Woodhall Ave, Hollis, New York 11423 -APT 1B

Monday September 30, 2024

**HONORABLE UNITED STATES JUDGES**

United States Federal Magistrate Judge James R. Cho and

United States Federal Judge Nina R. Morrison

President Theodore Roosevelt United States Courthouse

Eastern District of New York **DEMAND FOR ORAL ARGUMENT**

225 Cadman Plaza East **EVIDENCE FABRICATION and FORGED**

Brooklyn, New York 11201

Re: Vidyartie Ganesh V. NYPD Police Officer William Clemens, Shield # 27464, Police Officer Patrick Fitzmaurice, Shield # 11671, Police Officer SGT John Mccormick, Police Officer LT Simon, Police Officers John/Jane Doe(s) # 1-3, Dara E., The City of New York, John and Jane Doe State Dara E. Mccants Prosecutor, and Home Depot Inc. 22- CV- 02396 - NRM – JRC

Re: FALSE POLICE WITNESS IN HIDING FOR YEARS AND EVIDENCE FABRICATION AND FORGED. POLICE FALSE WITNESS MUST BE ARRESTED AND PROSECUTED FORTHWITH AND UNTIL THE WHOLE WORLD HEARS AND CONDEMN !!!

Dear Judge James Cho:

Defendant New York City **FRAUD** on this Court Cannot Continue. I write in Reply to your ORDER dated September 16,

1

2024, Regarding Defendants Motion to Stay Discovery. First, I was **NEVER Served**. I checked My Email and I didn't See any Motion from Defendants Attorney. Hence, I cannot Respond to their Motion to Unconstitutionally Stay Discovery to Dismiss said Case without Knowing in writing the Reason and Basis for said **DISHONEST** and Unconstitutional Motion thereby Violating Plaintiff's Due Process Rights Constitutionally Guaranteed by the 14th Amendment to the United States Constitution.

On or about September 13, 2024. The **UNAUTHORIZED and HOSTILE** Attorney Oconner Called Me and told me that He is Filing a Motion to Stay **DISCOVERY**. I Told him that I am NOT Consenting to that, and I WARNED him NOT to Speak to Me, and that I Cannot Speak to him because he has to File a **Notice of Appearing** with this Federal Court. And that, I can only Speak to Attorney JOSEPH ZANGRILLI and Receive Singed Documents only from Mr. Zangrilli and No Documents from him Mr. Connor on behalf of the Defendants which will NOT be Recognized as VALID.

2

Despite the Fact, that I WARNED him Mr. Connor before and he still Continued to Harassed Me by his Actions. NOTICE is hereby Given that, Any DOCUMENTS from this Lawyer is Constitutionally Invalid, Unless he Files a <u>Notice of Appearance</u> in this Federal COURT and Serve it on Plaintiff that he Represent these Defendants.

Your Honor, allegedly Defendants Filed a Motion in this COURT on or about September 13, 2024, to Stay Discovery to Fraudulently Dismiss My Case without Trail, which is unheard of, in any Civilized **COURT** and they Never Served on Plaintiff or the Plaintiff Never received it on to this day.

Your Honor, I think on September 30, 2024, is the Deadline for Discovery.

The Defendants Filed a Motion to Dismiss with another JUDGE in this Federal Court. Thereafter Defendants Attorney Filed Motion allegedly with your COURT to STAY Discovery on or about September 13, 2024.

## Your Honor, Plaintiff – Ganesh, Could NOT Completed Discovery for THREE REASONS:

1. The Defendants Attorney Mr. Joseph Zangrilli, allegedly Filed a Motion to Stay Discovery on or about September 13, 2024, without Plaintiff Consent and his Failure to Communicate with Plaintiff – Ganesh and Repeated FAILURE to Cooperate with Plaintiff and **EFFECTIVELY STOPPED ALL Discovery** on or about September 13, 2024, long before the Deadline of September 30, 2024.

2. Plaintiff – Ganesh had a DEATH in the Family.

3. Thereafter, Plaintiff – Ganesh had a Foot Surgery conducted by American Foot Doctor Contributed or Caused by the NYPD Racist and Reckless Police Illegally and Unconstitutionally, and by Force Putting Chains on Plaintiff Feet and Forcing Plaintiff to Walk with these Chains on Plaintiff Feet thereby Damaging and Causing Serious Injuries to Plaintiff Feet and left Plaintiff in Severe Pain and Suffering for the Rest of his

4

Life and Plaintiff having Great Difficulty Walking and in Severe Pain and said Injuries will be Permanent.

4. Your Honor, Despite the above mentioned Plaintiff – Ganesh Still Could have Completed 3 of the main Depositions, but Defendants Attorney JOSEPH ZANGRILLI Stopped Discovery by Filing Motion to STAY on or about September 13, 2024, and Failed or Refused to Speak to Plaintiff and Refused to Cooperate.

5. Your Honor, on September 25, 2024, I called the Pro-se Office and I Spoke to Ms DON, she said her Name is. I asked Ms. DON, if the Court Conference for October 1, 2024, before JUDGE James Cho is on. Ms. DON told Me that there is NO Court Conference before Judge Cho, for October 1, 2024, and that there is NO Court Conference for October 2024, before Judge James Cho in this case.

6. No one informed Me that the Court Conference before JUDGE James Cho was Cancelled for October 1st 2024.

**Therefore**, It is Right and JUST to Reject Completely Defendants Unconstitutional Motion to Stay Discovery. Your Honor, Please ORDER the Defendants and their Attorney to Produce the Proof of the Service upon Plaintiff – Ganesh of their Motion to Stay Discovery Proving that it was sent to My Email to Plaintiff – Ganesh.

And for the **REASONS** Stated above that the COURT Extend the Time for Discovery Caused by the Defendants FAILULE and REFUSAL to Comply with its Discovery Obligations and did in Fact, **in Violation of this Court own Order** and other Discovery Violations.

An for an ORDER that the Court Conference after October 14, 2024, because Plaintiff have to Answer Defendants Unconstitutional Motion to Dismiss by October 14, 2024. See also attached others Documents. I will Argue the Motion in Open Court. Also, Plaintiff is NOT in the Jurisdiction Right Now.

Dated: September 30, 2024.

Respectfully,

VIDYARTIE GANESH

PLAINTIFF – PRO -SE

To Defendants Attorney JOSEPH P. ZANGRILLI

**By Email jzangril@law.nyc.gov**

Dated: September 30, 2024.

**ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES ARE EXPRESSLY RESERVED.**

# $6.25M for a life ruined by cops

## Jury award for attorney beaten in bogus arrest

SHAWN INGLIMA

Lawyer Kenneth Perry won $6.25 million in a suit after a rough arrest in 2011 left him constant pain and unable to do the things he loved.

**BY GRAHAM RAYMAN**
NEW YORK DAILY NEWS

A Brooklyn jury handed down a $6.25 million verdict in the case of a lawyer who was badly roughed up and arrested during an encounter with cops in family court.

Kenneth Perry — who says the 2011 incident left him in near-constant pain — won the verdict late Thursday following a three-week trial.

"I live in pain. There's not a moment in my life that I'm not in pain," Perry, 69, told The Daily News on Friday. "These are supposed to be my golden years. Maybe I'll have money, but my golden years will never be golden."

tioning.

Perry, a veteran criminal defense lawyer, objected, telling the detectives not to question his client outside of his presence. One of the detectives started yelling at him and threatened to arrest him.

"Arrest me for what?" Perry answered.

The cops threw him against a wall, slamming his head. Outside the courtroom, the officers slammed him into the side of a police car. Perry spent 20 hours locked up and had to wait four months before the trumped-up charges were dismissed.

Perry's injuries exacerbated his lower back pain and he

couldn't go to my son's college games," he said.

"I used to be an avid motorcycle rider, and I had to give it up. Now, I go to work when I can, or I lie in bed at home most of the day. I can only take short walks with a cane."

During the trial, the detectives, Jason Palamarra and Samuel Calhoun, tried to blame Perry for the encounter, claiming he got first physical with them. But Perry's lawyer, Richard Levy, said security video inside and outside the courthouse proved Perry was right.

"None of what the officers claimed is supported by what's seen on the video,"

it compelling. His version of the facts was supported by witnesses, including a retired court officer."

In the aftermath of the incident, Palamarra was disciplined for failing to properly record the encounter in his memo book.

"I'm still in shock," Perry said. "The jury didn't know me from anywhere, so for them to reaffirm to me that I did nothing wrong is satisfying."

The city could appeal the verdict. A spokesman for the Law Department said the city is evaluating its options.

Sanford Rubenstein, Levy's law partner, urged Police Commissioner James

# City's police-suit info falls $hort

# NYPD'S HIDDEN COSTS

By CRAIG McCARTHY, RICH CALDER and BRUCE GOLDING

City Hall's official tally of NYPD lawsuit settlements is woefully incomplete — and fails to account for $22 million in deals struck during the first three months of this year alone, The Post has learned.

From January through March, 286 suits filed against the NYPD over alleged police misconduct were settled for a combined $16 million in taxpayer money, according to data on the city Law Department's Web site.

But thanks to a legal loophole, another 432 cases that were resolved in the same period aren't included in the Law Department's database, according to information obtained from the city Comptroller's Office through the Freedom of Information Law.

Those settlements, which are the most recent available, exceed the amount that the Law Department said was paid out by nearly 40 percent — and pushed the actual total to $38 million.

Under a 2017 law signed by Mayor de Blasio, the Law Department is required to post "information regarding civil actions filed in state or federal court against the Police Department or individual police officers" twice a year.

But the Law Department's latest data don't include 426 cases that were paid out by Comptroller Scott Stringer's office for a combined $16.9 million — because those cases were settled after complainants alerted the city of their intention to sue via a "notice of claim" but before a formal suit was filed.

suits that are more than five years old — of which there were six that settled for a combined $5.1 million from January through March.

Stringer has been aggressively settling claims since 2014 in an effort to stem litigation against the city.

Last month, he struck a deal to pay $9.75 million to Mark Denny, who spent nearly 30 years in prison for a robbery and rape at a Burger King in Brooklyn before being exonerated in December 2017.

Lawmakers who supported the 2017 law were unaware of the hidden figures until being informed by The Post.

Public Advocate Jumaane Williams, who was the bill's chief sponsor as a Brooklyn councilman, accused officials of undermining its intent.

The NYPD "was resistant to this law in particular, and they have been resistant to full transparency around these questions in general, so I'm not surprised that they would try to get around the spirit of what we are trying to do," Williams said.

A co-sponsor, Councilman Rory Lancman (D-Queens), pledged to introduce a measure to close the loophole, saying it was "hindering our ability to identify possible hot spots for misconduct."

A Law Department spokesman said the agency was following the "plain language" of the law and noted that it "does not even have copies of notices of claim in most cases until after the civil action is filed in court."

Stringer does not know how the Law Department crunches its data, a spokeswoman said.

De Blasio and the NYPD declined to comment.



New York Post, Monday, September 16, 2019

## $5M settlement didn't make cut

A city database meant to shed light on police-misconduct settlements is missing the largest deal struck in the first three months of the year — even though it involved cops on both sides.

Transit Officer Larry Jackson (pictured) agreed to take $5 million in January to resolve his claim that he was beaten and choked by fellow NYPD cops in 2010.

The payout wasn't included in a city Law Department database of settlements reached this year because a 2017 law creating that database exempted settlements from cases more than five years old.

Jackson's lawyer, Eric Sanders, called it "ridiculous" that the settlement was excluded because of when the case occurred.

"Of course, they like to hide things," said Sanders, who's an ex-NYPD cop. "The public should know about all public expenditures or transactions because it's the taxpayers' money."

In the case, Jackson claimed several officers punched, choked, pepper-sprayed and battered him with batons after responding to a 911 call at his home. City lawyers argued at trial that Jackson had punched one of the officers.

A Brooklyn federal jury awarded him $15 million in damages, but a judge reduced that amount to $5.45 million and Jackson agreed to drop an appeal in exchange for $5 million.

*Craig McCarthy, Rich Calder and Bruce Golding*

# Court awards tortured teen $6.5M
## – Judge says police doctor lacked professionalism



*Torture teenager: Twyon Thomas*



*Justice Roxanne George*

A court has awarded $6.5M in damages to a teenager who sued the state from her post after an investigation were doctored to conceal the outpouring of public anger with methylated spirit and set alight by police during a murder investigation in 2009.

The case had drawn local and international condemnation after a graphic photo of Twyon Thomas...

George, in a 36-page ruling handed down yesterday awarded $6.5M, though she found that the fundamental rights of Thomas were violated.

The civil matter was filed against the Attorney General of Guyana, and the Commissioner of Police, Sergeant Narine Lall and Constable Mohanram Dulai.

The Attorney General was also ordered to pay $100,000 in costs while Sergeant Narine Lall and Constable Mohanram Dulai, the two policemen accused of torturing Thomas, were ordered to pay $75,000 each in costs.

The Commissioner of Police was not made to pay anything.

The Judge also criticized the actions of Dr. Mahendra Chand, a police doctor, who had examined the injured teen while he was in police custody at the Leonora Police Station, as lacking "sensitivity and professionalism."

In January, the two policemen and another colleague, Corporal Oswald Foo, who were charged with malicious wounding, were set free by the Vreed-en-Hoop Magistrate's Court after the victim failed to turn up for 17 consecutive court dates to give evidence.

Attorney-at-law, Khemraj Ramjattan, who represented the teenager—who had since gone into hiding with his family...

In his deposition, the teen, who was born in November 1994, said he was beaten, burnt and suffered severe injuries at the hands of the police while in their custody.

In awarding the damages, the Judge noted that the matter was not one of damages for assault and battery and false imprisonment, but rather of a claim for redress.

She took into account that the teen's parents spent money on transportation and medical treatment and that he could not work because of the injuries.

She found that the detention by the police was unlawful and there was a flagrant abuse of power.

"The continued detention of Thomas in his seriously injured condition can be said to amount to circumstances of aggravation or individual suffering and distress.

"Other aggravating circumstances include that Thomas would have to live with the horrible physical and psychological memories and trauma of what was done to him, not by ordinary persons but by law enforcement officers who were bound to serve and protect him, more so as a child, even if he were a suspect in a criminal investigation; there is no evidence that he was."

She granted $1.5M as compensatory damages and another $3M as an award for the aggravating circumstances.

An additional $2M was awarded for exemplary damages.

"Thus the total award is $6.5M in damages. I am of the view that this global or total award reflects that there is a need for the realization and understanding that respect for the fundamental rights provisions of the Constitution and respect for the human rights of persons requires vigilance and carries with it tremendous responsibility."

Dr. Mahendra Chand was said to have examined the injured teen, who was 14 years at the time, in the lockups while his head was covered with a hood.

Earlier in December, the teen's mother, Shirley Thomas, when contacted by Kaieteur News, had denied that the family had reached a financial settlement with the accused ranks.

According to the mother, her son was in the interior and they were trying to locate him to inform him about the court date.

This publication had managed to contact Thomas's reputed husband, Doodnauth Jaikarran, who said that he and Ms. Thomas separated last year February and that he had not seen the woman and her son since.

According to Mr. Jaikarran, an individual had approached him to offer the family a settlement shortly after the torture incident was made public. He claimed that he rejected the offer.

Relatives of Deonarine Rafick, another accused, had admitted to accepting compensation. Rafick was charged in connection with the murder of Region Three official, Ramenaught Bisram, in October 2009.

However, he was released from prison after it was determined that the confession statement he gave was not free and voluntary.

One relative told Kaieteur News yesterday that the officers and other persons begged them to settle the matter.

# New York Law Journal

## COURT DECISIONS
To view our daily compilation of Court Calendars and Decisions, please see instructions below.

— DECISIONS OF INTEREST — WEDNESDAY, MARCH 15, 2023 —

**KINGS | REAL ESTATE**

## Plaintiff Establishes That Deed Was Forged; Court Voids and Cancels Deed



**Justice Debra Silber**
Supreme Court

In an action to quiet title, plaintiff asserted his signature on a deed that provided defendant with record ownership of 100% of the subject property was the result of forgery, fraud, trickery, deceit, and conversion as to plaintiff's real property, and sought an order declaring this deed void. Plaintiff also brought a cause of action for an accounting with regard to the rents, profits, and mortgages subsequent to the forged deed. Finally, plaintiff brought a cause of action to cancel the mortgage placed on the property by another defendant, now held by defendant Bank of America. Defendants asserted counterclaims for unjust enrichment and equitable subrogation and sought a money judgment, partly alleging that they satisfied plaintiff's 2003 mortgage when they took out the mortgage in 2006, which was later assigned to Bank of America. Among other things, the court found that plaintiff established that the deed was forged and is therefore entitled to summary judgment on that cause of action as well as a declaratory judgment that the deed is void and should be cancelled of record. Further, any mortgage or encumbrance on real property based on the forged deed is also void.

Amzalag v. ZBT Holdings Inc., 509474/2020 (February 28)

Guyana Times | WEEK ENDING OCTOBER 6, 2019 | GUYANATIMESINTERNATIONAL.COM    NEWS 7

# 'US must stand in support of Guyana as it heads to elections'

### – says Chair of US Senate Foreign Relations Subcommittee on Western Hemisphere

United States (US) Senator and one-time Republican Presidential Candidate, Marco Rubio has urged that the US stand in support of Guyana as it heads to election and seeks to elect a new Government.

The Senator made this call in a tweet from one of his official accounts on Monday. According to the Senator, he is looking forward to the democratic electoral process in Guyana, which he referred to as the US' "important regional ally".

"It's in our strong interest to stand in support of the Guyanese people, as they seek to elect a new Government that can advance their security and prosperity," the US Senator also said in his tweet.

In a message on his social media account referring to Rubio, Private Sector Commission (PSC) Chairman, retired Captain Gerry Gouveia echoed the calls for free and fair elections. He noted that this, together with respect for the rule of law and the Constitution, is what matters.

"What matters to us in the Private Sector is that Guyanese are afforded a fair and free elections free from violence that we suffered in 1992, 1997 and 2001. What matters to us in the Private Sector is that whichever party wins the elections reach across the political divide and truly find a way to work together for the children of Guyana's Future.

"What matters to us in the Private Sector is that the New Government rationalised our tax systems while creating the enabling environment to foster and enhance investors' confidence. What matters to us in the Private Sector is that job creation must be the daily [priority] of our country leaders," Gouveia added.

On Monday the President issued two proclamations officially declaring March 2, 2020, as elections day. The dec-



**US Senator, Marco Rubio**

laration, which is dated October 1, 2019, was issued in accordance with Article 61 of the Guyana Constitution, which states that the President shall by proclamation appoint a day for an election under Article 60 (2), and that an election of members of the National Assembly shall be held under Article 60 (2).

To this end, the President proclaimed that "...in pursuance of the said Article 61, I do hereby appoint the 2nd day of March 2020, as the day on which an election of members of the National Assembly shall be held under the said Article 60 (2)."

President Granger has been coming under immense pressure to issue his proclamation over the past few weeks. After almost a year of procrastination following his Government's defeat to a No-Confidence Motion, President David Granger on Wednesday last announced March 2, 2020, as the "earliest possible" date for elections, during an address to the nation.

In his address to the nation, Granger had spoken of a need for a return to the National Assembly in order to seek an extension of time for his Government in office. According to the President, the Government of Guyana "must, as a consequence, return to the National Assembly to request an extension. The National Assembly reconvenes on 10th October 2019".

The People's Progressive Party (PPP) has repeatedly affirmed that it would not return to the National Assembly to grant the Government the two thirds vote it needs to extend its life in power.

# An extra $1B ... So what?
## Adams: Bump from state for migrants won't nix budget cuts

BY CHRIS SOMMERFELDT
NEW YORK DAILY NEWS

Mayor Adams threw cold water Tuesday on the idea that he could back off some of his proposed city budget cuts in light of his administration securing $1 billion in migrant crisis aid from the state.

The mayor has for months argued that the city's ballooning migrant crisis tab necessitates budget belt-tightening across the municipal government.

So when Gov. Hochul announced last week that this year's state budget will include $1 billion to offset the city's costs for housing and providing services for migrants, some local elected Democrats voiced hope that Adams would reconsider cuts he included in his most recent city spending proposal for the 2024 fiscal year.

At a Brooklyn news conference Tuesday morning, Adams all but slammed the door on that suggestion, arguing the $1 billion in state funding isn't enough to avert city budget austerity.

"I don't know if people are aware of what we say is the financial impact on the city — $4.3 billion," Adams said, referencing the amount of money his team projects the city will spend on migrant-related costs by July 2024. "So because we are getting a billion, which is coming in [by] a billion, which is coming in, do we go back and just spend wildly again? No. The city must be efficient without layoffs and without cuts to services."

As of the end of March, the city had spent $817 million on shelter, food and services for more than 50,000 migrants, most of them Latin Americans, who



Dozens of migrants gather outside the American Red Cross building in Hell's Kitchen. The city has seen an influx of migrants seeking asylum in recent months. LUIZ C. RIBEIRO FOR NYDN

have arrived in New York since last spring, according to Adams' office. Adams' administration estimates the total will hit $1.4 billion by July 1. So far, the city has received only $8 million in aid from the federal government, though much more is likely to be allocated in coming weeks.

Against that backdrop, Adams last month unveiled an executive budget blueprint for the 2024 fiscal year that included various city spending reductions, including for the city's three library systems. Embattled agencies like the Human Resources Administration, which has struggled to fulfill its basic duty of processing applications for food stamps and cash assistance, were not spared from Adams' proposed executive budget cost cutting.

The mayor has argued that if the city doesn't spend cautiously now, it will likely be forced to enact more drastic cuts in future years.

City Council Democrats, including Speaker Adrienne Adams of Queens, have pushed back against the mayor's budget vision and vowed to fight to reverse the cuts before a final spending plan must be adopted by July 1. They've argued the city can afford to maintain current social safety net spending while also accommodating migrants, pointing to better than expected tax revenue projections.

Brooklyn City Councilman Lincoln Restler, a Democrat who is co-chairman of the chamber's Progressive Caucus, expressed dismay over Adams' reluctance to scale back his proposed cuts despite the state aid — and questioned his usage of the word "wildly."

"Preventing cuts to essential services isn't spending wildly," Restler said. "It's delivering what New Yorkers desperately need and deserve, including funding our schools, mental health services and affordable housing."

Rendy Desamours, a spokesman for Speaker Adams, also took issue with the mayor's use of the term "wildly," and noted that spending at the Human Resources Administration is so low many families have waited beyond the 30-day window required by state law for food stamp applications to be processed.

"Where is the efficiency in a low of 19% ontime approval of food assistance for New Yorkers or massive delays to processing housing vouchers that help New Yorkers avoid [homelessness]?" Desamours said. "New Yorkers can't afford a city budget that falls short of delivering services because city agencies are not supported to fulfill their fundamental responsibilities."

At his news conference, Adams countered that the migrant crisis isn't the only fiscal challenge on the city's horizon.

"We have to really acknowledge the turbulent forecast that's in the future. Wall Street is not doing well. We are seeing real challenges that the city is facing," the mayor told reporters. "We're going to be smart, prudent protectors of New York City taxpayers' dollars."

The mayor also took issue with his budget proposals being characterized as "cuts."

He said the trims he has baked into his spending plans are mostly based on the Program to Eliminate the Gap, or PEG. Those efforts are designed to shave costs without disrupting services, he said.

"When I ran for office, if you go look at the tapes, you'll see the tapes stating that I'm going to find efficiencies in government, and we're going to do PEGs," he said.

"The New York City public heard me say it, they heard others talk, and they said, 'Nope, we like the plan that Mayor Adams, the candidate is running,' so that was the right thing."



# Guyanese man wins lawsuit against NYPD

Real Estate Broker Leyland Roopnaraine has won a settlement in a lawsuit filed 3 years ago against the NYPD and the City of New York.

The former public school teacher and community activist did not disclose the amount of the settlement but stated that it is a substantial amount.

In a brief comment, Roopnaraine said this should be an example for everyone for the simple reason that a policeman cannot just arrest someone and place such person before the court without the necessary investigations.

Mr. Roopnaraine stated that it has become customary for persons to be arrested simply through a phone call! He stated that while there are very decent police officers in the NYPD, some of them are "bullies and take advantage over immigrants and minorities".

According to reports, the Guyanese born real estate developer was (falsely) arrested in



April 2014. It is alleged that four men, not wearing uniforms or displaying any police badges, walked into his office and told him to get up. When he asked who they were he was told 'shut up, just come with us!' He was allegedly handcuffed and placed in the back seat of an unmarked car and taken to the 113 Precinct where he spent over 8 hours in detention and interrogations. He was denied water and food and twice placed in interrogation cells where he was questioned and threatened with jail time by police officers. He was then taken by police vehicle to Central Boking where he spent a further 5 hours in detention. Throughout the night he had to sleep on a cold, bare concrete floor in a cell.

The charges filed against him were subsequently thrown out as the police could not put forward any evidence.

At the time the alleged crime was committed Mr. Roopnaraine was in Florida and offered to go home for the plane ticket. This was denied. He sued for wrongful arrest and detention, malicious prosecution, violation of civil rights and inhuman treatment while in police custody. When asked what he will do with the money Mr. Roopnaraine said that he will use it wisely to ensure his daughter finishes college, buy a new car, and travel around the world.

He was represented by the firm of Rubenstein and Rynecki, attorneys-at-law. The firm is noted for handling major cases like Sean Bell, Abner Louima, Eric Garner and other police brutality case.

Police Department of the City of New York
83rd Precinct
480 Knickerbocker Avenue
Brooklyn, New York 11237
(718) 574-1605

September 20, 1996

Vidyartie Ganesh
217 Highland Place
Brooklyn, NY 11208

Re: 272 Jefferson Street, Brooklyn, NY
289 Jefferson Street, Brooklyn, NY
306 Jefferson Street, Brooklyn, NY
308 Jefferson Street, Brooklyn, NY
309 Jefferson Street, Brooklyn, NY
311 Jefferson Street, Brooklyn, NY

Dear Mr. Ganesh:

We are in receipt of your notarized letter dated July 5, 1996 (and keys for all of the above premises) giving permission and authority to enter all of the above mentioned premises to break locks and doors to investigate and arrest trespassers. Also, we are aware of the incident whereby you were beaten and robbed in front of your office.

There were two big raids made on Jefferson Street on 7/16/96 and 8/14/96 and there were trespassers arrested from your building. Mr. Ganesh, Inspector Tom Daly and I thank you for your kind and diligent cooperation. If we didn't have those keys we could not carry out those operations and our profound thanks to you.

On September 17, 1996 you and Mr. Soto met with Inspector Daly and I at our request to discuss the drug activities on Jefferson Street. We again would like to thank you both for your concern and readiness to make our community safe and drug free.

We look forward to work with you in the future. If you have any problem in the block please don't hesitate to call us.

Sincerely,

Sgt. Smolinski
83rd Precinct